# Henry White *against* Andrew Flannigain and others.

Where a person sells property lying within the limits of a city, and in the conveyance bounds such property by streets, designated as such in the conveyance, or on a map made by the city, or by the owner of the property, such sale implies necessarily a covenant, that the purchaser shall have the use of such streets.

The complainant in this case is entitled, under an implied covenant, to a particular right of way ; any obstruction which denies the exercise of this right, works irreparable mischief to the street, *as a street.* He is entitled to the use of the street, as a street, and his title is clear, and equity may give him relief by injunction.

Cases of this description in which courts of equity will interfere.

The nature of the right sought to be protected, must be constantly kept in view ; a street in a populous city, is a very different thing from a road in the country.

Our acts of Assembly, relative to the opening of streets in Baltimore, do not any of them give to the complainant, as matter of right, the redress to which he is entitled. It cannot therefore be said, that because of these acts of Assembly, the complainant is not remediless, except in a court of equity.

Of the plea of limitations, though insisted upon in the answer, the defendant cannot avail himself, upon a motion to dissolve an injunction.

White *vs.* Flannigain.

A bill of this description, in order to entitle the complainant to an injunction, must show that the obstruction complained of, works to his great injury, and in manifest violation of the obligations of the party, whose conduct is complained of, and the facts stated in the bill must show the truth of this.

APPEAL from the equity side of the Superior Court of Baltimore city.

This cause was argued on bill and answers.

The original bill in this case was filed to obtain the opening of a forty-five foot street in the city of Baltimore, which was obstructed by the defendant below, Flannigain, by his co-defendants, the Trimbles, and by their tenant Taylor. The amended bill made other persons defendants, who obstructed the same street in other parts of it, but as these other persons, viz: Kirbys and West, assent to the decree asked for, it is not necessary to further notice this part of the case here.

The accompanying diagram will illustrate the location of the property.

The original bill of Mr. White avers, that in dividing the real estate of Thomas McElderry, deceased, a number of streets were laid out by the commissioners through the property to be divided, among which was a forty-five foot street running along the west side of Union Dock from Wilk street, extended to a twenty-two foot street, also laid out in the same division; that the heirs took possession of and held their lots as binding on said streets, and not only held them, but sold them as so binding; that lot No. 128, which is at the corner of the forty-five foot street and the twenty-two foot street, and fronts on the forty-five foot street, and is separated from a wharf property of the complainant White by the twenty-two foot street, was sold to Robert Oliver, and was described in the conveyance thereof made to him by one of the heirs in 1830, as binding on the forty-five foot street, and is now held by White under a conveyance from Oliver's heirs; that the four lots on the forty-five foot street, immediately north of the complainant's lot No. 128, viz: 129, 130, 131 and 132, are owned by the defendants, Andrew Flannigain and the heirs of Samuel Trimble, as tenants in common, and were conveyed

White *vs.* Flannigain.

WILKES STREET EXTENDED.

West & Kirby's Lots.

33 FOOT STREET.

West's Lots.

132. Flannigain's Lot.

131. Do. Do.

130 Do. Do.

129. Do. Do.

No. 128. White's Lot.

22 FOOT STREET.

WHITE'S WHARF.

BASIN.

45 FOOT STREET.

UNION DOCK.

30 FOOT STREET.

BASIN.

EXPLANATION.—A. place of obstruction across street.
*a. a.—b. b.* fences erected by Flannigain.

to the said Flannigain and Trimble in November 1839, by a deed which described them as bounding on the said forty-five foot street; and that Flannigain, notwithstanding the terms of his deed and his repeated recognition of said street, maintains, and for some time has maintained, on behalf of himself and his co-tenants in common, fences running across the said forty-five foot street, extending from their front to the edge of the dock, and enclosing the greatest part of the bed of the said street, and occupies more or less the whole of the bed of the street so enclosed with lumber and other things, so that all passage along the said forty-five foot street, to and from the complainant's lot No. 128, and to and from his wharf, is thereby wholly prevented.

The bill prays, that the fences so running across said forty-five foot street may be taken down and abated, and all obstructions to passing along the bed of said street within said fences be removed, and the erection of other fences and obstructions perpetually enjoined, and also prays general relief, and in the meantime asks a temporary injunction, directing the defendants to forbear erecting any new fences across the forty-five foot street in front of their lots, or placing any new obstructions on the bed of the said street.

The answer of Flannigain admits White's possession of the wharf to the south of the twenty-two foot street, but not his ownership, and that lot No. 128 was conveyed to Oliver, but does not admit that it now belongs to White; that about 1823, Thomas McElderry's estate was divided among his heirs, by commissioners appointed by Baltimore county court, and that said division calls for the supposed streets mentioned in the bill, but denies that the commissioners laid them out as streets; that under said division said heirs took possession, but never recognised said forty-five foot street except by the terms of the conveyances mentioned in the bill; that lot No. 128 was conveyed to Robert Oliver by one of the heirs by the deed referred to and filed with the bill, which describes it as binding on the supposed forty-five foot street, and that lots Nos. 129, 130, 131 and 132, are held by him and the heirs

of Samuel Trimble, under the deed of 1839, mentioned in the bill; that the complainant never has had access to lot No. 128 or to his wharf by the forty-five foot street, and never has used the same as a street, nor has any one else, but he and those under whom he claims have only had access thereto by a way about twenty foot wide, through lots Nos. 129, 130, 131 and 132, by the permission of the defendants, who have never interrupted him in it; and that he was using it at the time the bill was filed; that the said twenty foot way ran through the property of West till June 1850, when West blocked it up with a fence and began building, which was the first interruption of said way for more than forty years. When this interruption took place, he, (Flannigain,) gave the complainant a right of ingress and egress over his own lots, in the manner shewn by the plat filed with his answer.

Flannigain's answer also admits, that he maintains, and has always maintained fences, and occupies, and has always occupied the said forty-five foot street, as mentioned in the bill; and alleges that he has always occupied the street as his private property, and that it was so used and occupied by his grantors, so as to render a passage over it impracticable; and that he, and those under whom he claims, have been in the uninterrupted, exclusive, notorious, and adversary possession of the same, for more than twenty years prior to the filing of the bill, and that the whole of the forty-five foot street, from one end to the other, has been regarded and used, by all the proprietors on it, (including the complainant,) as private property, and that the complainant uses the twenty-two foot street in the same way.

Flannigain's answer then pleads limitations, and that the jurisdiction to open streets, is exclusively in the Mayor and City Council of Baltimore, and that this court, for that reason, has no jurisdiction, and concludes by alleging, that the obstructions in case of decree, may be removed in two or three days, and that the injunction is a serious injury to the tenant, Taylor.

The answer of Taylor, the tenant of Flannigain and Trimble, takes the same grounds with those above mentioned, only at greater length, and urges, in addition, that the remedy is at law. Another bill was filed by complainant, alleging, that Flannigain was about to apply to the mayor and city council, to have opened the forty-five foot street, down to water's edge, and prayed for an injunction to injoin him, which was granted.

The injunctions granted on the bills, were dissolved upon the coming in of the answers, and the present appeals are prosecuted to revise the orders of dissolution.

This case was argued before LE GRAND, C. J., and ECCLESTON and TUCK, J.

By *Campbell* and *Johnson* for the appellants, and *Gill* and *Schley* for the appellees.

*Campbell* for the appellant, after stating the case and accounting for the issuing of a second injunction, to restrain Flannigain from going on with proceedings in the city council, while the subject matter thereof was pending in court, insisted:

1st. That the division, made by Baltimore county court, of Thomas McElderry's real estate, calling, as it did, for certain streets, and dividing the property with reference to, and as bounding on such streets, was, of itself, a dedication of said streets to public use, and *a fortiori*, was it such when followed by sales made by the heirs of their lots, as so binding. *United States vs. Chicago*, 7 *Howard*, 196. 2 *Wendell*, 472. 8 *Wendell*, 99. 11 *Wendell*, 498. 4 *Paige*, 513.

2nd. That as it does not appear, by the bill or answers, that the forty-five foot streets, mentioned in said division, was laid down on the plan of the city of Baltimore, the intervention of the mayor and city council to open said streets, cannot be presumed to have been in the contemplation of the parties, but that they looked only to streets, the opening of which, depended exclusively on themselves; streets of that description,

in the city of Baltimore, being well known and recognised by law. 1832, ch. 57.

3rd. That even if this court shall take notice, for the purposes of this argument, of the fact alleged in the supplemental bill, and admitted by Flannigain, that the forty-five foot street is laid down on the city plan, yet that it cannot be supposed that the parties dedicating the street to public use, looked to the intervention of the municipal authorities to open the street, and meant only to dedicate in the event of the city's action on the subject, because, at the time this decision was made (1823,) the only power of the city to open streets, was conferred by the act of 1817, ch. 148, sec. 16, which confined the city authorities to opening such streets as were applied for by the proprietors of not less than two-thirds of the property to be taken for the bed of the street, and the necessary consequence would have been, that a purchaser of a lot would have had no power of himself to procure the action of the corporate authorities in regard to the street, for the use of which, he had paid in the value of his lot. 11 *Wendell,* 496.

4th. That even if the subsequent grant of power to the city, by the act of 1833, ch. 182, to open, by ordinance, without condemnation, any streets on the city plan, which were made the basis of a division of real estate, could be regarded as incorporating a new element in dedications made anterior to its passage, (which is, on principle, inadmissible,) yet, that the power of the corporation is limited, by that act, to cases in which the bed of the streets, proposed to be so opened, is unenclosed and unimproved, and that the corporation cannot, consequently, intervene in this case, because of the act of Flannigain, himself, in enclosing the bed of the street.

5th. That there is no law giving jurisdiction to the city council in cases of dedications of streets, but the one just referred to, (1833, ch. 182,) and that the only remedy, therefore, is in the courts, and that the only court cognizant to entertain a case of a dedication made by agreement, and not actually carried out by an opening of the street, (which would vest the right at law,) is a court of equity, and the appropriate remedy,

an injunction. One result of the action of the court, will be to enable the city to proceed under the law of 1833, ch. 182. *Barclay and Howell*, 6 *Peters*, 507. 4 *Paige*, 513. 8 *Wendell*, 99. *Sandford's Chancery Rep.*, 507, 508. 2 *Story's Equity*, sec. 927. *Eden on Injunctions*, 221, 222. 2 *Humphrey's*, 169. 6 *Hammond*, 298. 7 *Hammond*, 217. 8 *Barbour's Sup. C. Rep.*, 580. , 6 *Eng. Cond. Ch. Rep.*, 8. 15 *Simon's*, 378. 10 *Connecticut*, 250. 3 *Gill*, 162.

6th. The objection of want of parties, (since remedied,) cannot avail on the motion to dissolve. 12 *Gill and John.*, 16.

7th. The answers rely on twenty years adverse possession of the bed of the street, which is only a plea of limitations, and unavailable on this motion. 5 *Gill*, 186. 12 *Gill and John.*, 157.

But the objection fails in fact, because the deed under which Flannigain and the Trimbles claim, was executed in November 1839, and its terms describing their lots as bounding on the forty-five foot street, are an admission by them of the existence of the street at that time, which was not twelve years before the filing of this bill. 17 *Mass.*, 415. 10 *Pickering*, 316. And the knowledge of Flannigain, the landlord, is the knowledge of Taylor, the tenant. 47 *Law Library*, 116.

The second injunction was granted on a supplemental bill, which alleged, that Flannigain had applied to the city council since the original bill was filed, and asked it to open, by condemnation, (under the act of 1838, ch. 226,) a street forty-five feet wide, on the west side of Union dock, from Wilk street to the basin, which street so applied for by him, was from Wilk street to the twenty-two foot street, the same with the street proposed to be opened by the present proceedings. The supplemental bill prayed an injunction to restrain Flannigain from going on with the proceedings before the city council, while the subject matter thereof was pending in court, and the court granted the injunction, but on the coming in of the answer admitting the facts, dissolved the injunction. The supplemental bill, and answer to it, shew, that the forty-five foot street is laid out on the city plan.

On the part of White, it will be contended, as regards the second injunction, that it ought not to have been dissolved: Because it is within the jurisdiction of chancery to prevent an application, by a party, either to court or legislature, in a proper case.  22 *Cond. Eng. Ch. Rep.*, 666.

And this was such a case, for while the very matter before the court, raised by Flannigain's answer, was, whether the jurisdiction belonged to equity, or the municipal corporation of Baltimore? it was plainly necessary, to the ends of justice, that the party making the question of jurisdiction, should wait its decision, and not be at liberty to decide it for himself, in advance of the court.

*Gill* for the appellee.

The bill, itself, presents no case for an injunction.  It does not state the effect or character of the division ; nor does it state that the street was laid out, or that it was used by the complainant.

Answer states, that for forty years it has been used as it now is.  He referred to 9 *G. & J.*, 468.

His positions were :

1st.  That an injunction was not the proper remedy in this case.  The fences and obstructions complained of, had existed for many years, without complaint from complainant, or those under whom he claimed ; and that even if he ever had a right to the summary redress of injunction, he had lost it by lapse of time, and neglect to enforce his rights at an earlier period.

And that complainant had failed to exhibit, in this case, such irreparable mischief, as would entitle him to the redress by injunction ; and that he had failed to establish a case, showing that he had himself done that, which he sought to force the defendants to do, and was not, therefore, entitled to the redress asked for by him.

2nd.  That the division of the real estate of Thomas McElderry, and call or recognition of the streets therein set forth, was not, of itself, sufficient to dedicate the same to the

public; and in this case, under the circumstances, did not dedicate the same, nor give any right of use or of way over the same.

3rd. That even if the division of the estate, as shown, did amount to such a dedication, as could have given a right of way or use, over the same, to the heirs of Thomas McElderry, or those claiming under them, still, the facts as alleged in the answer, that no such right was used or claimed, but by common consent the said streets were used as private property by those owning the lots fronting on the same, from the year eighteen hundred and twenty-three, the time of the said division, to the year eighteen hundred and fifty, a period of twenty-seven years, is conclusive against the claim now set up, and estops the complainant from making the same, and is tantamount to a release thereof.

4th. That the commissioners who divided the estate, did not, in fact, open the said streets. They left the title of the bed of the streets in the heirs of Thomas McElderry, jointly, so that when they came to be opened in due course of law, none of these heirs, or those claiming under them, could claim the payment of any but nominal damages for said opening. The commissioners neither opened the said streets, nor did they give any right of way through them. They are neither public streets nor private streets; all the commissioners did, and all they had a right to do, was to leave the title to the streets in the heirs, jointly, and so far as these streets were concerned, to make no division at all. The commissioners had no right or power to go farther than they did go. These streets are not to be regarded as either public or private streets, but are merely inchoate streets, liable to be opened in due course of law, whenever the proper time, in the opinion of the proper authorities, which, in this matter, are the Mayor and City Council of Baltimore, shall have arrived, and that without the allowance of damages.

5th. That the division of the estate of the late Thomas McElderry, is to be regarded as a whole and specific performance, can be enforced only by a bill, properly framed and

against proper parties, and neither of which requisites have been complied with in this case.

6th. That the complainant has full, complete, and adequate redress for the grievances complained of, by making application to the Mayor and City Council of Baltimore, to open the streets: or any of them, laid off or called for in the division of the said real estate. That so far from pursuing this course, he has applied, and in the first instance obtained, an injunction, prohibiting Andrew Flannigain, one of the defendants in this case, from applying to the Mayor and City Council of Baltimore, to open the forty-five foot street.

7th. That the true question in issue in this cause, is as to the proper tribunal to carry into effect the division of the estate of Thomas McElderry, so far as relates to the said streets : the complainant insisting upon the mode adopted by him, the defendants insisting that the Mayor and City Council of Baltimore are the proper and legitimate tribunal, which is clothed with full and adequate power and authority, to carry into effect the true object and intention of the division of the said estate, and to make the said streets what they were designed to be; that is to say, public streets, with all the privileges and advantages belonging to public streets, and not private streets, or mere rights of passage or way, as sought to be made by complainant.

8th. That the second injunction which was granted in this case, by which Andrew Flannigain was prohibited from applying to the Mayor and City Council to open the forty-five feet street, from Wilkes street to the termination of Union dock, on the south, was properly dissolved ; that the only mode by which the division of the estate of Thomas McElderry could be properly consummated : was by such application: any other mode would be partial and incomplete, and fail to produce the desired object, and to carry out the true intent and meaning of the division of the said estate. That the second injunction was erroneously granted, and was properly dissolved ; and that the first injunction having been dissolved, the second, which was a mere incident of it, must necessarily fail.

9th. That the complainant as owner of lot No. 128, had no right or claim to the bed of the street forty-five feet wide, opposite to lots of defendants; that the lot No. 128, was in 'no respect to be regarded as a superior lot; and even if it were to be so regarded, still the complainant was bound first to open and free from obstructions the bed of the said street, opposite his lot, before he could claim the injunction as asked for by him in this case.

10th. The streets laid down in the division of the estate of Thomas McElderry, are the same streets which were laid out by the town commissioners, under the act of 1817. In dividing the said estate, the commissioners did nothing more than lay off the same streets as had been laid off by the town commissioners, and, like them, intended that these streets should be opened only when the proper time, in the opinion of the public authorities, had arrived, and consequently the only effect of the division was to leave the bed of the streets in the heirs jointly of Thomas McElderry, so that when the streets or any of them came to be opened, no damages, except nominal, could be claimed for such opening.

11th. That the bill in this case was not properly framed, had not the proper averments, and has not made the proper parties, to entitle complainant to the relief prayed for.

In support of the foregoing points, he cited the following authorities: *Mayor and City Council of Baltimore vs. White,* 2 *Gill,* 444. *Underwood vs. Stuveysant,* 19 *Johnson,* 186. *Clapp vs. McNeal,* 4 *Mass.,* 589. *Howard vs. Rogers,* 4 *H. & J.,* 270. *Schroeder vs. Creed,* 16 *Eng. Ch. Rep.,* 29. *Amelung vs. Seekamp,* 9 *Gill and Johnson,* 468. 4 *Law Lib.,* 47. 2 *Bland,* 99. 2 *Bland,* 461. 3 *Bland,* 125, 72 *Law Lib.,* 86. 22 *Me. Rep.,* 211. 6 *Pickering,* 326. *Acts of* 1817, *ch.* 168. 1833, *ch.* 182. 1838, *ch.* 226. 3 *Daniels' Chan. Prac.,* 1751 *to* 1761. 2 *Story,* 921 *to* 929. 5 *Me.,* 292. 3 *Green's Reports,* 234.

*Schley* on the same side.

With respect to the second injunction, it presents the question, shall a man be hindered from pursuing his legal reme-

White *vs.* Flannigain.

dies? Such a power could not reside in any court of justice. The application by Flannigain, of which the complainant complains in his bill for a second instruction, was to accomplish the contract upon which the complainant insists.

With respect to first injunction, he observed, that the defendant grounds his right entirely on the division of McElderry's estate, yet does not say, when or how it was made; he does not state the streets to be public streets, or even that they were opened. Instead of charging an injury irreparable, he does not state any injury at all. He wishes Flannigain not to use his lumber yard, (which he has been using for a long time,) until the right is tried.

An easement must be by grant.

If in point of fact upon the case made by bill and answer, the complainant is not entitled to relief, the injunction ought not to be continued. Even if at the final hearing the party may be entitled to relief, yet it is a question, whether he can have relief before a final hearing.

This is an injunction, at the instance of an individual, for a nuisance. 8 *G. & J.*, 479. *2nd Green Ch. Rep.*, 136. 11 *Mees. and Welsby*, 827.

There was no enjoyment or user of the road. 2 *Green Ch.*, 234. 5 *Maine*, 291.

Equity never interferes after long acquiescence. This right it is said has existed for 30 years. 18 *Con. Ch. Rep.*, 186, *(margin.)* 22 *Maine Rep.*, 211.

He must show that he has used it. 4 *Law Lib.*, 41, *(49.)* 6 *Pick.*, 326, 400, 401, 403, 405. *Story, secs.* 921, 929. 9 *G. & J.*, 468. 4 *Gill*, 364.

It is not necessary to come into equity, even if equity had jurisdiction. City authorities have ample power to act in such cases. He referred to the acts of Assembly and ordinances.

Chancery has no power in such cases: cannot abridge or extend a street.

He cited 19 *John. Rep.*, 186. 16 *Eng. Ch. Rep.*, 29.

68        v. 1

MARYLAND REPORTS.

*Johnson.* 1st. What is the right of the appellee as made either by the bill or answer? 2nd. Whether he has the right by any laches of his own, or by adversary possession? 3rd. If he has the right, is he not entitled to the protection which the injunction grants him?

Under the act of 1817, the commissioners located the streets. The persons appointed to divide the estate of Thomas McElderry among his children, divided it into the five lots, 128, 129, 130, 131, 132. Lot 128, was conveyed by one of the heirs to Oliver, and the lots of Mrs. Gill, were conveyed to Flannigain. All of these lots are to run with, and to be bounded by forty-five feet street. This was never used as a street, but the complainant, in order to go up to the city, went into another street or way, which run through the lots, and if established as a right of way, would have destroyed the lots.

If an owner lays out lots, and then sells and conveys them, the purchaser has a right of way. The description of them as streets or alleys binding on lots, gives them an additional value. Even if the deed conveys only the land included within the boundaries, he has a right to the use of the street. Grantor is estopped from saying that there is no street there. 17 *Mass.*, 415.

Complainant had a right to the use of the forty-five feet street, and there is no right without a remedy. It is said that the city authorities have all necessary power. But if chancery had jurisdiction, it has not been taken away by any of the acts of Assembly, and therefore still exists.

It may be to the interest of the complainant, as it is his right, to keep this a private way: but if he applies to the corporation, it must be to make it a public street.

Is not the complainant entitled to an injunction? The authorities relied on by the defendants, *(9 G. & J.,* 472, and 4 *Gill,* 34,) are misapprehended. The plaintiff is entitled to the use of the forty-five feet street, as a street, a right to pass up and down the street. Flannigain, when he got his deed in 1839, had notice that the owner of lot, No. 128, would have the use of that street.

White *vs.* Flannigain.

9 *Gill and Johnson*, is different. In that case, the right was doubtful. The remedy at law as adequate as that in chancery. The case of a mere trespass, not destructive to inheritance, and when complete damages may be obtained at law, does not, it is true, furnish a case for relief in chancery. But if the character of the act is such that it destroys the property as property, the street as a street, then an injunction will be granted. If a man works a mine, going into his neighbor's land, an injunction will be granted, because the tendency is to destroy the plaintiff's mine as a mine. A diversion of water from a mill, goes to the destruction of a mill as a mill.

7 *Johnson Ch. Rep.*, 330. All the cases are referred to. "Adequate relief," that is, if he can get at law all that he is entitled to, in the character in which he has a right to use it, in which it belongs to the owner.

Nobody will buy the lot, unless he can get the use of the lot : gets nothing but a right to sue every day for being deprived of the use of it.

The title in this case depends entirely upon the title papers, and the question is, do they give the complainant a right to the use of the street ? Such title is an equitable title, the *locus in quo* belongs to McElderry's heirs. It is an implied covenant, that the owner of 128, may have the use of the street.

*Story's Eq. Jurisprudence, sec.* 927, the cases which authorise an immediate interposition. See also 4 *Paige*, 513.

Flannigain took his deed in 1839. He is estopped from saying that there was then any use of the street, adversary to the rights of complainant, it there appearing that the owner of No. 128 was entitled to forty-five feet street.

As to any defects in the averments of the bill, it is apprehended that the bill sets out the case sufficiently, and if it does not, the answer supplies its defects.

LE GRAND, C. J., delivered the opinion of the court.

The order which we pass in this cause, makes it our duty,

under the act of 1832, ch. 302, to dispose of all the questions which may arise out of the record.

Several objections have been urged to the equity set up in the bill of complaint. These are as follows:

1st. That the street in question, is not such a street as gives to the complainant any right to its use.

2nd. That if. it be such a street, yet the complainant has mistaken his remedy, which, it is claimed, is at law, and not in equity.

3rd. That the averments in the bill, are insufficient.

We propose briefly to examine these points of objection in the order in which we have stated them.

It is alleged in the bill, and admitted in the answer, that the *locus* in question, and also the neighboring possessions of complainant and defendants, were originally the property of the late Thomas McElderry, and that it was divided, laid off, and sold to the present owners, as bounding on and calling for the streets delineated on the plot which accompanies, and is, in fact, a part of the pleadings in the cause.

The question, then, is: what is the effect of such division and sale?

We hold, that where a party sells property lying within the limits of a city, and in the conveyance, bounds such property by streets designated *as such*, in the conveyance, or on a map made by the city, or by the owner of the property, such sale implies, necessarily, a covenant that the purchaser shall have the use of such streets. The value of property within a city, is, as is well known, much enhanced by the number of its feet which may bound on streets, either private or public, and the fact is notorious, that proprietors of land, with the view of increasing the value of it, very frequently divide it so as to establish streets at points where there are none, under the authority of the corporation. When a sale, therefore, is made in conformity with such plan, it seems to be but plain justice to insist that the vendor, and all claiming under him, should be held bound by the lines and designations by which the property has been sold. This doctrine is fully established by a

number of adjudications, but a few of which, however, we deem it necessary to notice.

In the matter of the application of the mayor, &c., in relation to the extension of Lewis street, in the city of New York, 2 *Wendall's Reps.*, 475, the court say, they "are, therefore, of opinion, that when a building lot is sold, bounded on a street in the city of New York, designated as such upon the map of the city, or on a map made by the owner of lands, in reference to which sales are made, although the street remains *at the time unopened*, under the authority of the corporation, a *covenant* may well be implied, that the purchaser shall have an easement or right of way in the street, to the *full* extent of its dimensions."

According to this authority, the sale made by the heirs of Thomas McElderry, gave to the purchasers, by virtue of an implied covenant, an easement or right of way to the forty-five feet street, designated on the plat to the full extent of its dimensions; a right in no way affected by the circumstance, that at the time of sale, the particular street was unopened.

The same doctrine is recognised and established in *Parker, et al., vs. Smith, et al.,* 17 *Mass.,* 415. The court there say: "The principal question in this case, arises upon the construction of the deed of Joseph Russell to Benjamin Taber, in which he conveys a piece of land in what is now the town of New Bedford, bounding southwardly and westwardly on a way or street. By this description, the grantor and his heirs are *estopped from denying that there is a street or way* to the extent of the land on those two sides. We consider this to be not merely a description, but an *implied covenant* that there are such streets."

The defendants in the case now before the court, admit the sale, according to the pretensions of the complainant, and deduce their own titles from the same source, exhibiting, by the conveyances under which they hold, a recognition of the existence of the forty-five feet street. If, then, the case in 17 *Mass.*, be law, and we regard it as such, the defendants, in the absence of all title but that derived from McElderry, are es-

topped from denying there is such a street as that over which the complainant claims a right of way. The principle of *Parker vs. Smith,* is re-affirmed in *Emerson vs. Wiley,* 10 *Pickering,* 316, in which it was held, that such a call for a street, is not mere matter of description, but an implied covenant that there is such a street.

But, it is said, these views are in conflict with the doctrine laid down in *Underwood vs. Stuyvesant,* 19 *John. Reps.,* 186. We think not. That case was decided on the ground, that the streets therein referred to, were laid out *on the contingency* that they would be adopted by the local authorities. *Wyman vs. Mayor of N. Y.,* 11 *Wendall,* 500.

It is supposed, however, that the case of *Howard vs. Rodgers,* 4 *Harr. and John.,* 278, is an authority conclusive against the appellant upon this question. On a careful examination of the *record* in that case, we find it is different, in an essential particular, from the statement in the printed report. The object of Col. Howard, was to lay off a *public square* for the use of the State, *in the event of the removal of the seat of government from Annapolis to Baltimore;* and the record shews such to have been the public square contemplated by him, and not that it was, *in any event,* to be dedicated to the public use of the city of Baltimore. The case appears to us to be within the principle of the one in 19 *John. Reps.,* where the lot was sold as binding on a street, and which the purchaser took subject to the contingency of its being adopted as a public street by the authorities of New York. If the seat of government had been removed to Baltimore, and that lot had been selected for the public buildings, Col. Howard could not have resisted a claim to have it so dedicated. The lot sold to Rodgers, called for *German* street, which *street* bounds on the *square* intended for public uses. If German street had been then, for the first time, laid off on the plot mentioned in the record, Col. Howard could not have rightfully closed, or refused to have opened it; his vendee having purchased under an implied agreement, that he should have that right of way along the front of his lot. And if, as we presume was the case,

German street was then a public street, the reference to it must be taken as merely descriptive of the location of Rodgers' lot.

The next question presented for our consideration is: whether equity will interpose, by *injunction,* to protect the right of way of the complainant?

It is contended, on the part of the defendants, that even if the complainant be entitled to use the street in passing to and fro from his lot and wharf, yet he has mistaken his remedy in invoking the extraordinary forms of a court of equity, and that he would have sought redress, if entitled to any, at law, which is capable of giving him complete and adequate relief. In support of this view, the case of *Amelung vs. Seekamp,* 9 *Gill and Johnson,* 468, and the case of *Hamilton vs. Ely,* 4 *Gill,* 34, are relied on. We do not concur in the construction which has been placed on these cases by the court below, and by the counsel for defendants.

We understand the case in 4 *Gill,* as merely affirming the principle previously laid down in the case in 9 *Gill and John.,* which we take to be this: that a court of equity will not, as a general rule, interfere by injunction, to restrain a mere trespass, pending litigation at law, to try the title to land; but that it *will* so interfere under certain circumstances, which are, as enumerated by the Court of Appeals, under its late organisation:—

1st. To prevent irreparable mischief or ruin.

2nd. To prevent a multiplicity of suits.

3rd. Where it is required by some peculiar circumstances.

In the case of *Amelung vs. Seekamp,* the court adopted the views of Chancellor Kent, in *Jerome vs. Ross,* 7 *John. Ch. R.,* and also the views of Justice Story, in his work on *Equity Jurisprudence.*

In the case of *Jerome vs. Ross,* Chancellor Kent very fully reviews the course of decisions in England, and in the State of New York, and, as we understand his opinion, recognises the following principles:

1st. That an injunction will not be granted to restrain a trespasser, *merely because he is a trespasser.*

2nd. But that an injunction will issue where the injury is irreparable; *or*, where full and adequate relief cannot be granted at law; *or*, where the trespass goes to the destruction of the property as it had been held and enjoyed; *or*, where it is necessary to prevent multiplicity of suits in cases where the right is controverted by numerous persons, each standing on his own pretensions.

In the case before us it appears, that the wharf of the complainant, as laid down on the plot, has no outlet over the land, except by means of the thirty feet street; the twenty feet way and the *locus* in dispute. To the twenty feet way the complainant has no right, except such as grows out of the permission of the defendant Flannigain, which may be withdrawn by him, from all we can see, whenever it may suit his pleasure. There is nothing in the case to show the present condition of the thirty feet street; it may be wholly closed up by buildings or otherwise. The bill avers, that the complainant cannot have access to his lot and wharf along the forty-five feet street, except over the obstructions which have been placed on said street; and the defendant Flannigain admits, this street is closed up by obstructions placed there by himself, and points out the twenty feet way as the only one by which the complainant can approach his lot and wharf. Considering this case, therefore, as presented by the bill and answer, we must regard the twenty feet way as the only one open to the complainant, and even that, as wholly dependent on the pleasure of the defendant Flannigain.

In such a case as this, is it necessary that a suit should be instituted and prosecuted, to a successful termination at law, before a court of equity can interpose by injunction? A majority of the judges who sat in this case think not.

Chancellor Kent, in his collocation of cases in *Jerome vs. Ross*, when speaking of the application of the remedy by injunction, says: "The practice has been introduced, and justly and reasonably applied to special cases, where irreparable ruin would have followed the refusal to injoin the trespass. It was allowed by Lord Thurlow, in *Fleming's* case, (cited, 6

*Vesey*, 147,) where the defendant had worked from his own land into the coal mine of the plaintiff; and that case was followed by Lord Eldon, (6 *Vesey*, 147, 7 *Vesey*, 307,) on the principle, that irreparable mischief and ruin of the property, *as a mine*, would be the consequence, if the party was not stopped. On the same ground, the injunction is granted against diverting a water course from a mill, (1 *Bro.*, 538;) against the destruction of timber, (10 *Vesey*, 290;) against the taking of stones of a peculiar value, (17 *Vesey*, 128.) But all these are cases of great and irremediable mischief, which damages could not compensate, because the mischief reaches to the *very substance and value of the estate*, and goes to the *destruction of it* in the *character* in *which it is enjoyed*."

Now the principle on which the court interfered in these cases is, that the trespass produced a mischief which reached to the very substance and value of the estate, and *went to the destruction of it in the character in which it is enjoyed*. In the cases reported in 6 *Vesey*, 147, and 7 *Vesey*, 307, relief was granted on the principle, that irreparable mischief and ruin of the property as *a mine*, would be the consequence of the trespass. The case now before the court falls directly within the principle. We have seen that the complainant is entitled under an implied covenant to a right of way over the forty-five feet street. Any obstruction which denies the exercise and use of this right, works irreparable mischief to the street, *as a street*. The thing ruined by the obstructions is *a street*, and, as in the case of the *mine*, the complainant, on the principle there recognised, has a right to the aid of a court of equity. What he complains of is, the *destruction* of the *street*. He is entitled to the enjoyment of it as a *street*. His title is *clear*, and, as we have already observed, cannot be denied by any one claiming under the heirs of McElderry. In the case of *Hughes vs. The Trustees of Weston College*, (1 *Vesey*, 188,) the commissioners of a turnpike company entered, took possession of, and were destroying, by digging for gravel, large garden grounds of the plaintiff, who was a gardener by trade. The turnpike act had specially excepted

gardens, as well as orchards, planted walks, &c.; Lord Hard-
wicke thought it a clear case of trespass, and of such a nature,
that the plaintiff was entitled to seek his remedy by injunc-
tion, *though he had his remedy at law.* The interposition in
that case, was clearly on the ground, that the orchard and
garden, *as such,* were being destroyed. On such a case,
although the party could have gone to law and had damages
for the injury done him, yet, as these damages could not
restore the *thing,* to wit, the *garden,* the court of equity gave
him the relief sought.

In judging of the application of the remedy by injunction,
reference must always be had to the nature and character of
the thing to be protected. In the case of the mine, to which
we have referred, the thing was the coal; in the case before
us, it is the *street.* By throwing obstructions over the street,
so as to prevent a passage along its bed, it is just as much
destroyed as if it were covered by a house; in the language
of the authorities, it is irreparable mischief, because it destroys
it as *a street.*

Justice Story says, (2 *Equity, J. P. sec.* 926,) "That
where a party builds so near the house of another party, as to
darken his windows, against the clear rights of the latter,
either by contract, or by ancient possession, courts of equity
will interfere by injunction, to *prevent* the nuisance, as well
as to remedy it, if already done, although an action for dam-
ages would lie at law: for the latter can, in no just sense, be
deemed an adequate relief, in such a case. The injury is
material, and operates daily, to destroy or diminish the com-
fort and use of the neighboring house; and the remedy, by a
multiplicity of actions, for the continuance of it, would fur-
nish no material compensation." And in section 927, he
observes, "cases of a nature, calling for the like remedial in-
interposition of courts of equity are, the obstruction of water-
courses, the diversion of streams from mills, the back-flowage
on mills, and the pulling down of the banks of rivers, and
thereby exposing adjacent lands to inundation, or adjacent
mills to destruction.. *So where easements or servitudes are*

*annexed by grant or covenant, or otherwise, to private estates.*"
And there are cases in which courts will interfere to prevent
multiplicity of suits and vexatious litigation.    2 *Story's Eq.
Jur.*, 930.    *Lucas vs. McBlair*, 12 *Gill and Johnson*, 1.

We do not understand the case of *Amelung vs. Seekamp*,
as in any degree conflicting with these well established prin-
ciples, so far from it, we regard it as distinctly recognizing
and confirming them.

What was that case?    It was a case in which the com-
plainant asked the interposition of a court of equity, on the
ground, that a right of way over the land of the defendants,
had been obstructed by them; alleging that he had instituted
his suit at law, to recover damages for the trespass.    He
claims the easement, on the ground of user, for more than
twenty years, and alleged, that by the obstruction complained
of, "great and irremediable damage will accrue to him, his
mills aforesaid, being thus wholly cut off from their ancient
and accustomed outlet.

Now we do not understand the court as saying, that that
would not have been a proper case for an injunction, had the
complainant shown by the averments and facts, stated in his
bill, that the obstructions of which he complained, would work
irreparable mischief to him.    So far from it, we understand
the court as asserting directly the reverse.    After alluding to
the statement in the bill, that great and irremediable damage
would accrue to him, the court proceed to say, "but the rea-
sons are not given, the facts not stated, which shew the
court, that this great and irremediable damage, would re-
sult by the continuance of the obstruction."    And, say the
court: It is not charged, that he has no other *reasonably con-
venient* outlet from his mills, that by this obstruction, a valu-
able portion of the customers of his mills, will be driven from
them.    The mere allegation of a complainant, that irremedi-
able damage, or irreparable mischief will ensue, is not suffi-
cient.    To satisfy the conscience of the court, the facts must
be stated, to show that the apprehension of injury, is well
founded.    Without such a statement of facts, no injunction

HARVARD LAW SCHOOL LIBRARY

should have issued." And again, "so far," says the court, "from its exhibiting a case, where the *continuance* of the outrage complained of, would work great and irremediable damage, it shews one which warrants the inference, that the loss or injury would be trivial," &c.

The plain inference from all this, is, that if Seekamp had set out in his bill, a case of irreparable mischief, the injunction ought to have issued. And the court intimate, what would have made out such a case, to wit: that he had no other *reasonably convenient* outlet from his mills, and that by the obstruction, a valuable portion of the customers of his mills, would be driven from them.

We have already said, that in treating of a question like that involved in this case, it is important, the nature of the right sought to be protected, should be constantly kept in view; and it is no less so, that the *place* where the property is located, should be considered as an element of consequence. The dictates of common sense require this. A street in a populous city, is a very different thing from a road in an agricultural region. In the latter case, it may be of comparatively slight consequence, whether the road be in one place or another; an approximation to the reasonable convenience of the neighborhood and customary travel, is all that is generally desirable; but with the thronged thoroughfares of trade in a populous commercial city, a square may be of the greatest importance. In fact, property in a city derives its principal value from its location; its eligibility for business purposes, and in estimating this, facility of access is always deemed a circumstance enhancing the value; and therefore it is, the inhabitants of a city readily submit to the heavy burden of taxation necessary to the proper location of streets. In this view, therefore, we should not hold the same fullness of averment in a bill necessary, where the obstruction complained of, is a street. A road that would be reasonably convenient in the county, would render property, similarly situated in regard to streets in a city, comparatively, if not wholly valueless for business purposes.

It was urged in argument, that the municipal authorities of the city of Baltimore are competent to grant the relief which the complainant asks, and that he should have made his application to the mayor and city counsel to have opened the street. An examination of the several acts of Assembly on this subject has brought us to a different conclusion.

By the 16th section of the act of 1817, ch. 168, the city is only authorised to open, widen, extend or straighten any street or alley, on the application in writing of the proprietors of *two-thirds* of the property intended to be taken.

By the act of 1832, ch. 57, the mayor and city council of Baltimore are authorised, in *their discretion*, upon the application of the proprietors of a majority of the feet, in front or length, or any private wharf, dock, street, lane or alley in said city, to cause the same to be paved, cleaned out, mended, or otherwise repaired or kept in good condition.

By the act of 1833, ch. 182, the local authorities are authorised on the application of one or more persons interested in *the ground to be taken*, provided the same be *unenclosed* and *unimproved*, to sanction any streets which may be laid out by heirs, joint tenants, or tenants in common, in any division of real estate which may be made by them.

And by the act of 1838, ch. 226, the mayor and city council have conferred upon them full authority to provide for the laying out, opening, extending, widening, &c., any street, &c., which, *in their opinion, the public welfare or convenience may require*.

Neither of these acts are adapted to the case of the complainant. By the act of 1817, ch. 168, the power of the city cannot be exercised, unless *two-thirds* of the proprietors of the property intended to be taken, should ask it. Under this act, the complainant of himself, could ask nothing of the municipal authorities, as his right, unless the requisite number of property holders should unite with him in the request. The act of 1832, ch. 57, submits the whole matter to the *discretion* of the mayor and city council, provided the proprietors of a majority of the feet in front, &c., shall authorize

its exercise.    Under this act they have no power to act, unless
the requisite number of proprietors grant it, and when the
power is conferred, they are under no obligation to exert it.
The act of 1833, ch. 182, confers no power over ground which
is *enclosed* or *improved*.    In the case before the court, the bed
of the street was enclosed, and was, therefore, not within the
statute.    And under the act of 1838, ch. 226, the power
to open is only to be exercised whenever the mayor and
council shall be of the *opinion* that the *public* welfare and
convenience require it.    The individual welfare and conveni-
ence of the complainant is not sufficient to call for the exer-
cise of the opinion of the mayor and council, and if they
were, the opinion which might be formed of them by the
mayor and council, possibly might be in direct opposition,
not only to his own judgment, but to his rights as guaranteed
to him by his contract.

From this brief analysis of these acts of Assembly, it will
be seen that the complainant could not ask, as matter of
right, that the particular street should be opened by the direc-
tion of the corporate authorities.

The plea of limitations relied on in the answer is not availa-
ble on a motion to dissolve an injunction.    *Hutchins vs.
Hope*, 12 *Gill and John.*, 257.

From this view it is apparent, a majority of the court are
of opinion that the complainant would be entitled to relief by
an injunction, provided he has made the proper averments in
his bill.    The next question then for our examination, is,
whether the averments are sufficient?    By the act of 1832, ch.
302, this court is precluded from noticing any objection to the
sufficiency of the averments of the bill, unless the exception
was taken below.

One of the exceptions below, was, that it is not shown by
the bill, that the injury complained of, is of that "material
and intolerable character which calls for the extraordinary
preventive remedy of an injunction."

We do not understand the court either in the case of *Ame-
lung vs. Seekamp*, or in the case of *Hamilton vs. Ely*, as say-

ing, it is necessary, in *words*, to aver the injury to be irreparable, but that *facts* showing it to be so must be stated in the bill.   In the case before us the averment is, that the obstruction complained of, works to his "great injury and in manifest violation of the obligations of the said Flannigain." This we consider a sufficient averment, if the facts stated in the bill show the truth of it, but this we are of opinion they do not.   It is nowhere alleged in the bill, that the complainant has ever used his lot No. 128, or his wharf; nor, that such use has been interfered with.   This, we think, essential to the relief asked.

We do not deem it necessary to expend too many words in regard to the dissolution of the second injunction.   The dissolution of the first, necessarily carries with it the dissolution of the last.   But independently of this, we are of opinion, that Flannigain had the right to apply to the city council, as he did, not having bound himself by any contract not to do so, and that the court of equity possessed no power to enjoin him from the exercise of a right, which, belonged to him in common with all other owners of property in the city of Baltimore.

The sixth section of the act of 1832, ch. 302, authorises the Court of Appeals to remand the case, where the "purposes of justice will be advanced by permitting further proceedings, or the introduction of further evidence or otherwise;" and following the precedent set in the case of *Brawner and wife vs. Franklin,* 4 *Gill,* 472, this court will sign a decree affirming the decision of the superior court, and remanding the case to said court, that such further proceedings may be had therein, by way of amendment or otherwise, as may be deemed proper.

ECCLESTON, J., delivered the following opinion :

I concur with the court in affirming the orders dissolving both injunctions in this case.   But I do not assent to all the views expressed by them, in their opinion, in regard to the

right of a party to invoke the aid of the extraordinary power of a court of equity, by injunction.

Conceding that the partition of the McElderry estate and the subsequent deeds for different parcels thereof, are to be considered as implied covenants, giving to the grantees under the deeds a private right of way, over the forty-five feet street, yet, if that street never was used as such, and the complainant stood by and saw the obstructions, of which he complains, existing for many years, I do not think he has a right to relief by way of *preliminary injunction.* Notwithstanding the industry and ability for which the counsel of the complainant are distinguished, no case, under similar circumstances, has been produced, in which such an exercise of the power of a court of equity has been successfully invoked.

In *Amelung, et al. vs. Seekamp,* 9 *G. & J.,* 475, after showing that the complainant had not set forth in his bill, such facts as established a case of irreparable injury, the court say : ''But if it were otherwise, the default of the appellee in standing by and permitting the appellant, Amelung, to enclose the land affected by the way in question, and to cultivate and improve the same for four years, would interpose a strong, if not an insuperable barrier to any interference in his behalf by way of preliminary injunction.'' That case was decided as late as the year 1838, by a full court, and without a dissenting voice.

BY THE COURT:

Order dissolving injunctions affirmed and case remanded under the act of 1832, for further proceedings.

*Case remanded.*