HAND v. SAVANNAH AND CHARLESTON R. R. COMPANY.

1. Where compensation is allowed out of a common fund belonging to others, for expenses incurred and services rendered in behalf of the common interest, it is upon the principle of representation or agency; *e. g.*, to the plaintiff in a creditor's bill, or to a defendant made a party as a representative of a class too numerous to be served.

2. No one can legally claim compensation for voluntary services to a party, however beneficial they may be, nor for incidental benefits and advantages flowing to a party as a result of services rendered under the employment of another party.

3. A bill against a railroad company to require the payment of certain unfunded coupons of their six per cent. bonds was filed by a holder of such coupons in behalf of himself and all others holding like coupons. Afterwards, certain holders of seven per cent. bonds of this company intervened by petition and made one S., a holder of six per cent. bonds, a party defendant in behalf of himself and all other holders of such bonds. S. employed counsel, and all creditors of the company were called in and made parties by advertisement.

The contest then arose between the sixes and sevens as to priority of lien, which was decided in favor of the sixes, and the railroad was sold for an amount insufficient to satisfy the prior lien. *Held*, that counsel fees out of the common fund should be allowed only to the attorney employed by S., although other counsel for other holders of sixes rendered valuable services to that class of bonds; but S. was made the representative of the successful class, and was therefore the only party authorized to charge the common fund with expenses.

4. And upon the same principle, counsel for plaintiff should be allowed a fee out of so much of the common fund as was payable to the holders of unfunded coupons of the six per cent. bonds.

5. Courts have no power to subject the property of citizens to claims, unless founded upon established legal or equitable principles making such property liable and constituting a cause of action. Courts have no power to adjust claims upon grounds of abstract moral equity.

6. An attorney for a stockholder successfully resisted the liability of the railroad to taxation, and by direction of the receiver resisted the claim of other parties to certain lands of the company; and another attorney appeared by direction of trustees of the seven per cent. bonds and rendered services in behalf of the property. *Held*, that neither was entitled to be paid out of the fund going to the successful sixes.

7. An attorney was employed by the receiver of the company to sue for a tract of land held adversely, and such attorney, by special contract, was to receive half of the recovery for his services. The land was recovered and was sold with all the other property of the company. *Held*, that this attorney was entitled to compensation out of the fund realized from the sale.

8. Costs should be taxed in favor of the successful parties.

Before COTHRAN, J., Charleston, April, 1883.

The opinion substantially states this case, but an elaborate statement of all the litigation in this cause may be found in 17 *S. C.*, 219, and in the other appeals to this court there referred to. The Circuit decree here appealed from was as follows:

The several matters which remain to be determined in this complicated litigation, which has been protracted for more than thirteen years, came on to be heard by me on Monday, April 2, 1883, and from day to day, for nine days. It would be tedious and unprofitable to relate the history of the case as it has wound its slow length along through many of the volumes of the Appeal Court Reports from the 5th *S. C.* to the 17th inclusive. Those

who are most interested, as well as a majority of the Circuit
judges, and all of the members of the Supreme Court, are
familiar with its details, and I shall therefore, after much con-
sideration, and with no small amount of embarrassment, grow-
ing out of the importance and very peculiar nature of the issues,
proceed as briefly as I can to state my conclusions.

The matters submitted were the following:

1. The amount of compensation due to the referee (Mr.
Pringle), and of the taxed costs of attorneys engaged in the
cause, and of the officers of court, including the present and for-
mer clerks and masters.

2. A proper allowance to Charles T. Mitchell, the receiver, for
the Bee's Ferry extension.

3. The claim of the eight per cent. bondholders, who insisted
that neither the statutory lien nor any mortgage prior to theirs
included the franchise, and that they were entitled to whatever
of value this indispensable element had given to the corporation.

4. Which of the many attorneys engaged in the cause were
entitled to fees and costs out of the common fund.

5. The amount of such fees and costs.

The question of attorneys' costs, embraced in the first proposi-
tion, was eliminated from it, and is set down in proposition five
as properly to be determined after settling the question of *the
right* of the attorneys to costs. The matter of compensation to
the referee and the costs of the several officers of court were
determined at the hearing, and an order made touching these
matters; so also as to the allowance to the receiver for the Bee's
Ferry extension, and the question involving the franchise.

In the orderly progress of the inquiry this brings us to the
fourth proposition: Who are entitled to fees and costs out of the
common fund? The Supreme Court say, at page 278 of 17 *S.
C.:* "It is always embarrassing for this court to attempt to adjust
costs and counsel fees, which more appropriately belongs to the
Circuit Court. It seems to us, however, that in this case there
should be some system upon the subject, and that the costs and
fees of all the attorneys properly chargeable for successful service
should be paid out of the common fund, so as to make the suc-
cessful litigants pay their proper proportion."

It was suggested at the hearing that this expression of the court is *obiter dictum,* but it will hardly be denied that as a legal proposition it is indisputably true. Indeed, the practice in this state, as settled by numerous decisions, and in strict conformity with the rule laid down by the elementary writers, is to allow counsel fees out of a fund to those who have recovered, or assisted in recovering, the same. Some of the writers use the term *created.* In the familiar case of a creditor's bill, where a fund is preserved or realized for the benefit of a class by the efforts of one or more of such class, the counsel representing those who have acted in behalf of the whole class are allowed their proper fees out of the fund. So where a trustee, as such, is involved in litigation, he is entitled to be reimbursed for counsel fees out of the fund; but the fund must be, or it must have been during the progress of the litigation, within his fiduciary control. In all other cases, each party must bear his own charges out of his own funds.

It is needless to cite authority in support of these propositions. The difficulty, however, arises in applying these familiar rules to the case in hand; and I find, moreover, in the condition of the seven per cent. bondholders, a manifest and very great hardship in the legislative delusion by which they have been victimized. The court, however, can furnish no remedy for this. At the close of the late war the Charleston and Savannah Railroad, from its exposed position and early capture by the Federal armies, was practically destroyed, and its stockholders and bondholders, as such, were financially in like condition. The sevens, relying upon the validity of the act of assembly in 1869, postponing the statutory lien held by the state as an indemnity for its guaranty, furnished the necessary money to rebuild the road. This has proved to be a delusion and a snare, and their money, advanced in good faith, by means of which the road was rebuilt, and increased value given to the sixes, has gone beyond the reach at least of the judicial department of the government.

On April 12, 1870, the plaintiff, Hand, holding a large amount of past due detached coupons of the sixes, filed his complaint in "behalf of himself and all other creditors of the Charleston and Savannah Railroad Company, standing in the same right, plight, and condition as himself," &c. This proceeding soon involved

the sixes and sevens in a contention for priority of lien, the value of the road being supposed to be inadequate for the satisfaction of both classes of creditors. It was a hard and uncompromising fight; the stakes were large, and very conspicuous ability has marked the progress of the cause from the beginning to the close.

The road was finally sold, and the sum of $300,000 realized, which is the fund now in the custody of the court for distribution. This has been decided by the Supreme Court to belong to certain of the sixes, who are not estopped, as are others of the same class, from claiming a *pro rata* thereof. All other claimants are denied the right to participate in the distribution of this fund. It is contended, however, by the attorneys of many of these defeated claimants, that they ought to have their costs and counsel fees out of what they call "the common fund."

At different times during the progress of the struggle between the sixes and the sevens there appeared upon the field other formidable contestants than those who were originally and mainly engaged: 1. The attorney general, in favor of the state, for taxes amounting to about $120,000. 2. The comptroller general, demanding the possession of the road itself, as forfeited to the state under act of 1869 for non-payment of interest on the bonds guaranteed by the state. 3. Material men (so called) and others, claiming damages for injury to persons and property. All of these were regarded by the main contestants as the common enemies of both, and upon their appearance the bugles rang loud; and contingents were detailed from the ranks of each, whose common efforts were directed against their common enemies. When these were discomfited, or driven off, the main fight was renewed, and the sixes were finally victorious.

It cannot be denied that valuable services were rendered by the contingents, but in my judgment such were only incidental and inspired by the hope that in the defeat of a common enemy the fund in controversy would be preserved, not as a common fund for distribution with their foes, but exclusively for themselves. It seems to me that the true character of the fund in controversy settles the question conclusively. The term "common fund" is relative in its true and proper sense. The

sixes having succeeded in establishing their right to it under the decision of the court of last resort, it is as to them and for them a common fund—itself insufficient for the satisfaction of their claims, and as none of the sevens can participate in its distribution, it follows, *ex necessitate rei*, that their attorneys, who can claim only through them, are in like manner excluded. The stream cannot rise above its source.

Having thus disposed of the claims of those representing the sevens, the material men, and all other claimants, excepting the successful sixes, it remains to determine which of these are entitled to have their fees and costs out of the common fund. The term *successful sixes* is used because the judgment of the Supreme Court clearly excludes certain of the sixes who had funded their coupons upon the principle of estoppel, amounting in all to about $60,000; and these being thus in no better condition than the sevens, their counsel are not entitled to have fees and costs, or either, out of the common fund.

It is worthy of observation that none of the counsel for the sevens make any objection to the allowance of fees and costs to the counsel of the sixes. Their clients having no interest in the common fund, these have simply claimed compensation for themselves for valuable services rendered in the course of the litigation, and are indifferent to the manner of distributing the residue.

It may be further observed that after the order for the sale of the road was made by Judge Aldrich, the priority of liens having been determined, a majority of the sixes combined together, forming a syndicate (or pool, in modern parlance), for the purpose of purchasing the road.

Some of the sixes declined to enter into this combination, and it is from these that the objection to the allowance of fees and costs comes. Mr. A. D. Cohen is the champion of this class, and with admirable temper has delivered an ingenious and forcible argument, insisting that each of the representatives of the successful sixes should be required to look to his own clients for compensation. The learned counsel, however, was too generous to be satisfied with his own conclusions, when he remembered that Mr. Hanckel, who, according to the famous judgment of the wise

Athenian, displayed in selecting the candidate best qualified for office, was the most deserving (perhaps) of the counsel of the sixes, and represented, at the close, only two or three bonds out of which, upon the principle contended for, he could be paid.

It appears that when Cutting's executors, holding a large amount of the sevens, intervened, and the lists were being set, it was necessary to select some one to represent the sixes. Mr. William B. Smith, holding the greatest number of these, was selected, and Mr. Hanckel filed an answer for him. During the progress of the litigation Mr. Smith sold out his bonds, but there is no evidence that the purchasers repudiate the engagement with the counsel already employed or at any time ordered him to desist. If it were necessary to do so, I would hold, in this regard, that these bonds, having been purchased when the litigation was flagrant, that the purchasers of such were affected with knowledge of the fact, and by not repudiating the engagement, assented to and are bound by it.

The fruits of this engagement with Mr. Hanckel, with efficient aid rendered at different stages of the controversy by Messrs. Buist, Brawley, and Lord (and others to be referred to hereafter), together with the valuable aid of the *contingents*, which must go without further requital than that already received by them, are as follows:

First and foremost, the establishment of the priority of
            the lien of the sixes,          .          .          .          .
Second.     The defeat of the claim for taxes,          .          $120,000
Third.     The defeat of the material men,     .          .          25,000
Fourth.     The defeat of receiver's certificates,     .          75,380
Fifth.     Bee's Ferry Extension, reduced from $59,474
            to $17,000,     .          .          .          .          .          .          42,474
Sixth.     The estoppel of six per cents. and claim by an
            equivalent of seven per cents. to substitution,          60,000
                                                                    ――――――
                                                                    $322,854

to say nothing of the Trenholm & Potter claims greatly reduced and a host of other floating debts under the administration of the receiver awaiting anxiously the result of the suits

already brought.   These great advantages have been gained for the sixes by deeds not done in a corner, but by strong and skilful contention over and over again in this forum, and in a higher one, upon both of which beats the fierce light of public observation.

Nor did these results fall out by chance, and whilst I do not feel authorized in entering upon the inquiry whether the *contingents*, whose aid was so potent, have been sufficiently compensated by the large sums already paid to them from time to time from the earnings of the road, it would seem to me to be an act of injustice, and in conflict with the principles announced in *Nimmons* v. *Stewart*, 13 *S. C.*, 445, and *Brooks* v. *Brooks*, 16 *Id.*, 621, to permit the supine sixes, who stood aloof and watched the progress of the fight, to come in now and share the fruits of victory without rendering a money equivalent for services which they lacked either faith or courage to contribute.   I have no hesitation in saying that Messrs. Hanckel, Buist, Brawley, and Lord are entitled to be paid the amount of the claim presented by them jointly, say ten thousand dollars, to be apportioned amongst themselves, as they may think proper, and also their costs, to be taxed as hereinafter provided.

There are other counsel engaged in the case, who also represent successful sixes.   I find myself unable, without the aid of additional testimony, to pass upon their claims.   No specified sums are claimed, and the nature of the services rendered are not in all of these very clearly made out.   I would prefer, therefore, lest an act of injustice might be done to some deserving of compensation, that all others representing successful sixes, and who have in any wise contributed to the results attained, file, forthwith, in the office of Master Sass, who, as the successor of Master Porter, has custody of the fund, specific statements of their claims for services rendered in the cause, with leave to offer proof to support the same.   I regret the delay caused by this course in settling these minor issues, but it is better to go slow than to go wrong, even in a cause that has already been more than a decade in court.

The master (Clancy) has made report upon the claim of James W. Moore, Esq., for professional services to the road in recover-

ing from a purchaser a large tract of land belonging to the railroad company, which had been sold for taxes in Beaufort county. The testimony taken by the master and sent up by him sustains fully his report, and the same is in all respects hereby affirmed.

Wherefore, it is ordered, adjudged, and decreed as follows:

1. That all claims for counsel fees and costs exhibited against the funds in question on the part of those representing the seven per cent. bondholders and the other claimants, excepting the counsel representing the successful sixes, be, and the same are hereby, denied.

2. That the master, in whose hands the funds in question are, do pay over to Messrs. Hanckel, Buist, Brawley, and Lord, upon their joint receipt, the sum of ten thousand dollars ($10,000), as a fee for professional services rendered by them in the above entitled causes; and that he do also pay over to James W. Moore, Esq., the sum of six hundred dollars ($600) together with the proper costs to the parties entitled to the same in the proceedings by which said last mentioned fee was established.

3. That the several counsel representing others of the successful sixes have leave to file their claims in the office of G. Herbert Sass, Esq., master, &c., if they choose to do so, stating specifically the sums claimed by them for professional services rendered in this behalf, exhibiting before the said master such proof as they may deem proper to sustain the same.

4. It is further ordered, that the clerk of this court do tax the costs due to the counsel above named, to whom fees are allowed by this decree.

*Messrs. Asher D. Cohen* and *Mitchell & Smith*, for bondholders.

*Messrs. B. H. Rutledge* and *H. A. M. Smith*, for H. E. Young.

*Messrs. B. J. Whaley* and *A. G. Magrath*, for J. B. Campbell.

*Mr. Joseph W. Barnwell*, for Buist & Buist, T. M. Hanckel, Samuel Lord, and W. H. Brawley.

*Mr. James Simons*, for J. W. Moore.

April 14, 1884.    The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON.    The case of *Hand* v. *Savannah and Charleston R. R. Co. et al.* has been before the courts for a number of years.    The road has been sold, the proceeds of sale collected, and the rights of the parties determined.    In fact, all of the questions involved, as between the litigants, have been adjudged.    The only matter remaining is as to the fees of counsel, which is now before us under this appeal.

In the consideration of this matter, it will not be necessary to review the whole case, or to state fully its entire history.    Only so much is needed as may be required to make the questions involved intelligible, and therefore only so much will be given. The case in its progress has been most earnestly and ably fought, and numerous counsel have been engaged.    It has appeared in different forms, and every inch of ground has been vigorously contested.    Its history may be divided into three stages :  *First.* The institution of the original action by Daniel Hand ;  *second*, the intervention of the comptroller and the attorney general of the state ;  and, *third*, the proceedings *in re* the executors of Cutting.    It will be necessary to state some of the facts connected with these three different stages, and to consider the case somewhat from the standpoint of each.

In 1853 the Charleston and Savannah Railroad Company was incorporated.    In 1856 the state by act agreed to indorse, upon certain conditions, and guarantee six per cent. bonds of this company, not to exceed $5,000 per mile, with statutory lien on the road.    Coupon bonds to the amount of $505,000, payable in 1877, were issued by the company under this act, and were indorsed by the State.    This amount did not prove sufficient to complete the road, and in 1858, with the view to raise an additional sum, the company conveyed the road to certain trustees, and issued additional bonds to the amount of $1,000,000, which completed the road.    After the war, the road was found greatly damaged, in fact in ruins ;  and for the purpose of rebuilding, the trustees above referred to proceeded to foreclose their mortgage, and in December, 1866, the road was sold, subject to the lien of the state under the act of 1856 above.    At this sale Geo. W. Williams and others purchased at the price of $30,000.    These parties pro-

ceeded to organize a new company by virtue of an act passed to that end in 1866, the style of this company being the "Savannah and Charleston Railroad Company."

This company being without means to rebuild, and not being able to issue marketable bonds with mortgage on the road so long as the lien of the state under the act of 1856 stood in the way, made application to the legislature to stand aside its lien. This was assented to by the legislature, and accordingly in 1869 an act was passed, authorizing the company to issue seven per cent. bonds to the amount of $500,000, for the purpose of reconstruction; upon which issue, it was enacted, the lien of the state should be postponed and become a second lien. These bonds were then issued, and the road was thereby rebuilt and put into operation. By the third section of the act of 1869 the company was authorized and requested to fund and redeem the coupons for interest of the six per cent. bonds issued by the Charleston and Savannah Railroad Company then past due, or that might fall due, by the first of September, 1869, by issuing an equal amount of their bonds with coupons attached at the rate of seven per cent., payable semi-annually; these bonds to be guaranteed by the state.

Under these circumstances, in 1870 there were outstanding as claims against the company the six per cent. bonds issued under the act of 1856, and unfunded coupons upon these bonds; bonds substituted for the funded six per cent. coupons under the act of 1869; the seven per cent. bonds issued under the act of 1869; and certain eight per cent. bonds. In 1870 Daniel Hand, holding unfunded coupons of the six per cent. bonds, to the amount of $27,705, besides interest thereon, instituted his action, in his own behalf "and in behalf of all other creditors of the Charleston and Savannah Railroad Company, standing in the same right, plight, and condition as himself, who shall in due time come in and contribute to the expenses of the action," demanding judgment: that an account be taken of the amount due to him upon the bonds and coupons held by him, and secured by the statutory mortgage to the state; that the same might be paid with the interest thereon by a certain day; and in default that the road be sold in satisfaction of his claim and of the claims of all standing

in the same right, plight, and condition with himself; that said creditors be called in; that injunction, restraining the Savannah and Charleston Railroad Company from appropriating and wasting the funds of the company, be granted; and that a receiver be appointed to take charge of the road until said claims were satisfied or the road sold, &c., &c. This action was commenced by Messrs. Buist & Buist, as plaintiff's attorneys. To this action the Savannah and Charleston Railroad Company and certain parties, trustees or mortgagees to secure the $500,000 seven per cent. bonds, were summoned as defendants, and also the state, through the attorney general, appeared as defendant. The company and the trustees appeared by Messrs. Campbell & Seabrook, attorneys.

This case being heard upon the Circuit in October, 1873, the Circuit judge decreed that the plaintiff, and other holders of coupons of the six per cent. bonds issued under the act of 1856, were entitled to be paid, with the interest thereon, and he ordered that the case be referred to a referee, with instructions to call by advertisement upon all persons holding past due coupons of said bonds to present and prove their claims on or before a certain day, and to the end that such further order as might be necessary should be passed, that the referee file his report immediately after the day fixed for the proof of claims. From this decree, the defendant, the Savannah and Charleston Railroad Company, appealed through James B. Campbell, attorney. This appeal was dismissed for irregularity without prejudice.

On the return of the case to the Circuit Court, a consent order was passed, by which the road was put into the hands of a receiver, with an advisory board of nine, to be operated, with quarterly reports to the court; the net profits to be applied quarterly to the six per cent. "coupons reported by the referee as proved under the previous order. 2. To all outstanding, unpaid, or unsatisfied coupons for interest then due and payable, or to fall due, in the order of their rank and right of payment, the right of payment or priority of lien to be referred to and determined by the court whenever they may arise after full hearing." 3. If any surplus of net profits should remain, the same to be applied to any other liens, if any, and then ratably to the unsecured debts of said company, the costs and disbursements of the cause to be

taxed and paid by the receiver, also proper counsel fees to both plaintiff and defendants, to be ascertained by a referee as thereafter to be ordered.

Charles T. Mitchell was appointed receiver under this order, with salary to be fixed by the advisory board, and to hold his office until the maturity of the six per cent. bonds, unless sooner removed upon the recommendation of the advisory board, and not otherwise, with leave to the Savannah and Charleston Railroad Company, at any time pending the case, upon showing that all interest coupons in arrear were paid, and all other unsecured debts arranged, to have the said railroad and property restored to them, with leave also to the receiver to hold the said road open to private sale upon terms to be reported to the court, at the same time enjoining all creditors who failed to come in under this proceeding from interfering in any way, by suit or otherwise, with said management. While this action was in progress, the comptroller general undertook to take possession of the road under the act of 1869, § 5, 14 *Stat.*, 202, and afterwards the attorney general instituted proceedings to foreclose the statutory lien to the state.

In 1875, the executors of Cutting, holding seven per cent. bonds issued under the act of 1869, *supra*, filed a petition, *in re* Daniel Hand, claiming that they were secured by the first and prior mortgage on the road, and prayed a foreclosure thereof. To this petition the Savannah and Charleston Railroad Company, Andrew Simonds, H. H. DeLeon, and Edwin Bates, trustees under the second mortgage to secure eight per cent. bondholders, Henry Gourdin, trustee, and Robert Adger, holders of said bonds, William B. Smith and James Conner, holders of the six per cent. bonds, and other creditors of the said company, were made parties defendant. Messrs. Memminger & Jervey filed this proceeding as attorneys for the executors of Cutting. Mr. Campbell answered for the receiver, Hon. A. G. Magrath for Simonds and other trustees, and Mr. Thomas M. Hanckel for William B. Smith. No other answers were filed. In this petition, after stating that the petitioner was the holder of a large amount of the seven per cent. bonds issued under the act of 1869, and secured by mortgage to William Aiken and others,

and also other indebtedness in New York, further stated, in paragraph 4, that besides these bonds and mortgages there is also the issue of $505,000 in bonds on the Charleston and Savannah Railroad Company, at an interest of six per cent., which is secured by the statutory lien of the act of 1856, as amended by the act of March 2, 1869, and of which the bonds and coupons held by Daniel Hand, are part and parcel, and that certain other bonds are in the hands of W. B. Smith and James Conner, and of certain other persons too numerous to be made parties, &c., &c., and the petitioner prayed that process might issue against all parties having interests in the premises who have not already become parties to the suit, to wit, certain persons naming them, among them W. B. Smith and James Conner, styled holders of some of the six per cent. bonds. As has been stated, Mr. Hanckel appeared and answered for W. B. Smith.

The case remained in this condition for a year or more, with negotiations for sale and compromise pending, but without any decisive action; when in 1877 an order referring the matter to Hon. W. Alston Pringle was made with instructions to call in all creditors both of the Savannah and Charleston Railroad Company and the Charleston and Savannah Railroad Company having claims secured by mortgage or other liens upon the property belonging to the Savannah and Charleston Railroad Company to prove their claims, &c. The reference under this order was extended several times, and after all claimants had presented and proved their different demands, the real contest began between the sixes and sevens as to the effect of the act of 1869 postponing in favor of the sevens the statutory lien created by the act of 1856, which had secured the sixes. In this conflict, it is conceded on all hands that Mr. Hanckel was at least the leader on the question presented in behalf of the sixes, with a most formidable array against him on the other side. He was the first in the field, by virtue of the fact that his client, W. B. Smith, was the only one of the sixes summoned who answered; James Conner, for satisfactory reasons to himself, finding that he could not ally himself with the sixes, and the other sixes, on account of their number, not having been specially summoned. They

were, however, called in, and were represented by their respective attorneys afterwards.

The referee finally reported in favor of the sixes. This report, after a most serious, earnest, and able contest, both in the Circuit and Supreme Court, was sustained, and the fruits thereof were awarded to the sixes by the court of last resort. Mr. Hanckel's appearance in the case was by authority of Mr. Smith, who had been selected by the petitioners, executors of Cutting, as a defendant representing the class of sixes to which he belonged; and having thus become a leader in the beginning, he so continued to the end, and his voice was the first and the last heard in behalf of the common right of the sixes. It is stated that he was greatly aided by Messrs. Buist & Buist, Mr. Brawley, and Mr. Lord, and by the respective attorneys of the different holders of the sixes, other than W. B. Smith, after their bonds had been proved; or at least that all of these attorneys rendered valuable services in support of the position taken by the sixes, that the act of 1869 postponing the statutory lien was unconstitutional. But Mr. Hanckel's client was the only one of the sixes who had been made a representative defendant, or, to use the language of the counsel, a *"head creditor."* He had been especially summoned by process; the others had been called in by advertisement, and made themselves parties by responding to the call, except Daniel Hand and those already in court in his action, upon which the executors of Cutting had engrafted their proceeding which precipitated the conflict between the sixes and sevens, and out of which this appeal now comes.

In the meantime, while the case of Daniel Hand was pending, and before the executors of Cutting intervened, and in fact before the appointment of the receiver above, a question arose as to the liability of the road for taxes, and a proceeding was instituted in the United States Court by Mr. H. E. Young, attorney, at the instance of Mr. Miller, "a large stockholder," it is said, to restrain the collection of these taxes, the amount involved being very large. An injunction was obtained on the Circuit; but after reaching the Supreme Court of the United States, the case was abandoned. The question again arose in the state courts, but finally the road was declared exempt. Several matters of litiga-

tion growing out of claims of certain ·parties, Potter & Trenholm, and others, to land affecting the road-bed and right of way, also came up, in which it seems that Mr. Young represented the company, or the receiver. For services in these respects up to October, 1874, it seems that Mr. Young was allowed and paid out of the income of the road the sum of $3,850, under an order of Judge Reed dated April 16, 1875, directing the receiver to pay the same, and other expenses and counsel fees embraced in a report made by Wilmot G. DeSaussure on these matters. This amount, in the claim now made by Young, has been credited on his account for services rendered on the question of taxes, and his present claim consists in additional services as to that question and the other matter above referred to.

Some time in 1876, one Richardson, having purchased at a tax sale a large tract of land, consisting of some 2,000 acres, located in Beaufort county, belonging to the Savannah and Charleston Railroad Company, and this fact being reported by the superintendent to Mr. H. E. Young, as one of the solicitors of the road, Mr. J. W. Moore, attorney at Hampton, was employed by Mr. Young, representing the company, to bring action for the recovery of this land, the terms being that the receiver would pay actual outlay and one-half of the recovery, land and damages. This land was ultimately recovered, and has been sold as a portion of the property of the company, the proceeds being incorporated in the general fund held for distribution among the sixes. Mr. Moore has presented a claim of fee of $600, which upon the testimony has been allowed in the decree of Judge Cothran.

The above presents the facts of the case now before us, upon which the questions of law as to the fees of the different attorneys arise. Judge Cothran ordered the master "to pay out of the common fund in his hands to Messrs. Hanckel, Buist, Brawley, and Lord, upon their joint receipt, the sum of $10,000 as a fee for professional services rendered by them in the above entitled cause," and to Mr. Moore the sum of $600, "and that the several counsel representing other successful sixes have leave to file their claims in the office of the master, stating specifically, &c., the sums claimed by them for their services, and exhibiting such proof as they may deem proper to sustain them." He also

ordered "costs to be taxed for the counsel above named, to whom fees are allowed by the decree."

Messrs. Simonton & Barker, Hayne & Ficken, and Asher D. Cohen, representing successful sixes, appealed upon exceptions. These exceptions raise three questions: 1. That the common fund in court ought only to be charged with the payment of the fees of such counsel as had authority to represent the successful sixes as a class. 2. That the judgment of the Supreme Court, April 12, 1879 (12 *S. C.*, 314), severed the rights of the several sixes, and that the only issue thereafter was an individual contest, and that the "common fund was not thereafter chargeable with fees for services rendered by the counsel of the individual bondholders;" and 3. That his honor erred in decreeing that costs should be taxed in favor of Messrs. Hanckel, Buist, Brawley, and Lord, instead of to the counsel representing the successful sixes.

Mr. Asher D. Cohen, in addition to the above, filed other exceptions as attorney for the executor of Townsend. These exceptions, however, are in substance the same as the above, and embracing an exception to the fee of Mr. Moore out of the common fund. Messrs. Mitchell & Smith excepted upon several grounds, all turning, however, upon the point that the common fund should not have been charged with the fees allowed, as these attorneys were not authorized representatives of the sixes; and Messrs. Whaley and Magrath excepted for William Aiken *et al.*, trustees, and for James B. Campbell, on the ground mainly, that their clients being trustees in possession, and necessary parties, it was their duty to resist the efforts of the comptroller general to seize the property in dispute, which successful resistance enured to the benefit of the sixes, and the expenses, counsel fees, &c., should be chargeable on the common fund, decreed to the sixes.

The underlying principle in all these cases, where one has been allowed compensation out of a common fund belonging to others, for expenses incurred and services rendered in behalf of the common interest, is the principle of representation or agency. Where such compensation has been allowed, the party claiming has been in some way the recognised and authoritative representative of the

whole and therefore authorized to contract for the whole. Thus, executors, administrators, and other trustees, being the legal representative of the parties interested in the trust fund or property, have been usually allowed credit for all necessary and reasonable charges incurred by them in the proper management and protection of the trust fund.

So, too, where the parties having a common interest, or are very numerous, and one of the class institutes proceedings for himself and all others belonging to that class, these latter afterwards coming in and claiming to share in the successful result, the law, regarding the first party as the representative of the latter, has recognized his right to charge to the common fund or property such reasonable and proper expenses, including counsel fees, as he may incur for the common and general interest.

This principle has been frequently enforced in behalf of a plaintiff in creditors' bills, and it also applies where the common interest belongs to the defendants, who being so numerous that one is selected and brought in by regular process as a representative of the class, while the others are called in by advertisement, who may come in or not as they choose; but if they do come in, must do so under the principle that the common fund shall be taxed with the reasonable expenses incurred by the representative. Thus it will be seen that such charges are allowed not *simply* and alone because services have been rendered which have been beneficial to the common interest, but upon the ground that they were rendered by the authority of those having the common interest exercised by the representative, the compensation for which was to be chargeable to the fund protected or recovered.

No one can legally claim compensation for voluntary services to another, however beneficial they may be, nor for incidental benefits and advantages to one, flowing to him on account of services rendered to another, by whom he may have been employed. Before legal charge can be sustained, there must be a contract of employment either expressly made or superinduced by the law upon the facts. And thus it is, as we have said above, that in the case of executors, administrators, and other trustees, and in creditors' bills, and suits of that nature, where the representative of a class

is the principal and first actor, either as plaintiff or defendant, the class being so numerous as not to be conveniently made parties individually, the law superinduces a contract on the part of all having a common interest, that the common property shall be chargeable with the reasonable contracts as to fees, expenses, &c., of the representative. Section 140 of the code provides, that "when the question is one of a common or general interest of many persons, or when the parties are numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole." See Mr. Pomeroy's discussion of this section, and the former equity practice. *Pom. Rem.*, § 389 *et seq.* This is the principle, as we understand it, upon which the questions involved here must be determined.

The class which has been successful at the end of this protracted and vigorously conducted contest, is the class known throughout the case under the name and style of the *sixes*. They had a common interest in the struggle, and the property has been sold and the proceeds adjudicated to them. They were not all summoned into the court by individual process; on the contrary, the most of them came in under the call by advertisement—all except Daniel Hand and those who stood with him, having unfunded coupons of the six per cents., they being already in court, and W. B. Smith and James Conner, the two last being especially summoned as holders of sixes.

Now, who of these parties was the representative of the sixes? No one but Smith, James Conner having declined to appear for them. Daniel Hand and those who stood with him in possession of unfunded coupons of the sixes, it is true, were interested in the question upon which the case ultimately turned, but Daniel Hand's proceeding was expressly for himself and "those who stood in the same right and plight with himself." He did not in any way claim to act for the benefit of the sixes generally, nor did he ask that they should be made parties either by process or by call, and but for the interposition of the executors of Cutting, Daniel Hand's case might have terminated without the sixes appearing. We do not see in the "Case" that the sixes as a class had any standing in court until the sevens raised the main question involved between themselves and the sixes and summoned

W. B. Smith as one of the holders of the sixes, omitting to serve the others because too numerous. ·Under these circumstances we must regard Smith as the representative of the sixes, and their only representative as a class, and consequently the only party authorized to charge the common fund with expenses.

Mr. Hanckel seems to have been the attorney employed by Smith. He answered for Smith, and it appears from several indorsements on the papers connected with the different references that he signed his name as the attorney of the sixes. Upon these facts we think that Mr. Hanckel is entitled to a proper fee out of the common fund in court other than that portion going to Daniel Hand and those who stood with him with unfunded coupons of the six per cent. bonds. No doubt it is true, that after the conflict commenced between the sixes and sevens, that Messrs. Buist & Buist and Brawley, who were representing unfunded coupons of the sixes, and Mr. Lord, did valuable and able services on the question of the unconstitutionality of the act of 1869, postponing the statutory lien of the state in favor of the sevens, but at whose instance, and by whose authority was this done ? Was it done by the authority of the sixes or their representative, W. B. Smith ? Can these parties come in under the principle we have laid down above ? Do not they rather occupy the position of rendering an incidental service, to parties not represented by them, but derived to them because their rights were involved in the same question, as to which they had been engaged for others ?

It may be that, inasmuch as Daniel Hand's suit was in the nature of a creditor's bill for those holding unfunded coupons, his attorneys, Messrs. Buist & Buist and Brawley (if the latter was engaged by Daniel Hand), would be entitled, under the above principle, to proper fees out of so much of the common fund as the holders of such coupons may be entitled to. Mr. Lord, it appears, represented those of the sixes who at one time had been represented by Mr. Brawley, and who had been turned over to Mr. Lord by Mr. Brawley, when he came to the conclusion that they were in conflict with the unfunded coupons standing with Daniel Hand.

Mr. Lord, it is admitted, rendered most effective and valuable

assistance in the interest of the sixes, but the question again recurs, upon whose authority? Was it by contract, either express or implied, made by one who could bind the common fund of the sixes? We do not find any allegation or statement of that kind in the case, and we do not see, therefore, how the claim, however meritorious in other respects, can be sustained against the protests of the sixes. This court has no power to subject the property of citizens to claims, except such as may be founded upon legal or established equitable principles making such property liable. It has no power to adjust claims upon grounds of abstract moral equity. On the contrary, a claim to be sustained by the courts must amount to a cause of action under some settled legal or equitable principle. Where are the facts in this case which would constitute a cause of action by these attorneys against the sixes?

The same principle which excludes Messrs. Buist & Buist, Brawley, and Lord will also exclude Mr. Young. His services in protecting the road from taxation and other claims may have enured to the ultimate advantage of the sixes. Yet it was one of those incidental advantages sometimes following acts which go beyond the object of the immediate employment and redound to the benefit of others besides the party authorizing it and for whom the act was performed. The same may be said as to the claim of William Aiken and Geo. W. Williams, and their attorney, Mr. Campbell. For such benefits the law has given no pecuniary compensation.

The claim of Mr. Moore, we think, occupies a different position from those we have been discussing. He was employed by the receiver or the solicitors of the company to sue for a tract of land, claimed by the company, then in the possession of another. He undertook the service under a special contract, to wit, one-half of the recovery, land and damages. He succeeded in recovering the land, which has been incorporated into the general property, his half as well as the other. The land has been sold and the proceeds are now in the common fund. After the recovery of the land, his special contract was subject to specific performance, and he might no doubt have claimed a partition. This was not done, however. On the contrary, as we have said, the

land has been sold and the proceeds are in court. We think he may pursue these proceeds and establish his claim against the fund instead of the land, which has been done substantially; and therefore there was no error in allowing his claim.

Such costs as the statute prescribes should be taxed in favor of the successful parties.

We repeat that it is not hereby intended to intimate that any of the gentlemen engaged in this case did not render valuable services for which as between attorney and client they should be paid, but simply to announce who are entitled by law to have a judgment of the court for fees out of the common fund.

It is the judgment of this court that the decree of the Circuit Court be modified as herein stated, and that the case be remanded to be carried out in accordance herewith.