On November 28th, 1910, the appellee filed a bill of complaint against the appellant, in which he alleged that the railroad company had from time to time dumped a large quantity of earth and cinders upon his land which adjoins its right of way, and had negligently and knowingly allowed a great quantity of earth and cinders to be shoved and forced upon his land because of the failure of the defendant to properly protect the embankment along its right of way. It then alleges that several days before the bill was filed the railroad company did by its agents and employees enter upon a part of the plaintiff's land and was engaged in digging a ditch upon his property, into which they were preparing to place a pipe about thirty inches in diameter, that they were about to cut down and destroy valuable trees on said land, the destruction of which would do great and irremediable mischief and injury to the plaintiff, his property and estate. The bill prayed that the company be restrained and enjoined from entering or digging upon his property, or from cutting down or destroying the trees or any part thereof.
An injunction was issued as prayed, and on January 17th, 1911, an answer was filed, in which the defendant denied the allegations of the bill and demurred to the whole bill, because on its allegations the plaintiff had a plain, adequate and complete remedy at law. Whether the answer overruled the demurrer is now immaterial, as the Court below dismissed the bill and no appeal was taken. Nothing further was done until January 10th, 1913, when the railroad company asked to have the motion for the dissolution of the injunction set down for hearing. An order was passed setting it down for hearing on January 16th, with leave to both sides to offer evidence, but on that date the company, with leave *Page 410 
of the Court, filed a "motion or petition" consisting of twelve paragraphs, in which it is alleged that on December 9th, 1835, the company acquired by purchase the parcel of land for its right of way and other corporate purposes which is set out in a copy of a deed filed; that it took possession of it and appropriated it to its corporate purposes and uses and constructed over it a high embankment of an average height of about twenty feet to secure the necessary grade, and built its railroad tracks thereon; that it has since the date of the deed held and had possession of the whole of said parcel of land, within the bounds thereof as described in the deed, and has maintained the embankment and tracks and has used and enjoyed the whole extent thereof, without any interference or disturbance until the filing of the injunction by the appellee; that at no time has the company invaded, or in any manner encroached upon the property of Silbereisen by its embankment, works or other railroad structures, and that any change in width or height or in position of said embankments has always been and is now within the limits of the property lines of the company; that on or about November 28th, 1910, in the necessary care and upkeep of the said embankment, and for the purpose of discharging its duty and obligation to provide safe, convenient and quick transportation of its passengers and freight, and wholly within the limits of its own property, it began to lay a drain or pipe line to carry off the surface water, when the injunction was obtained on the untrue and unwarranted statement that the drain and ditch were on the land of the plaintiff, and would cause him irremediable mischief and injury.
It is then alleged that although the defendant company had filed its answer denying the allegations of the bill upon which the injunction was issued, and although the plaintiff did not proceed thereafter in said equity cause, yet on the ____ day of December, 1912, and on divers other days, between that day and the filing of the motion or petition, the plaintiff entered upon the land of the defendant and wrongfully *Page 411 
dug up and hauled away the earth and soil for the distance of three hundred feet along the western line of said lot, of the width of four or five feet and of a depth of three feet, — all said acts having been done wholly within the lines of said lot of defendant which was then in its possession; that the plaintiff claims title to a portion of the original tract under a common owner or grantor with the defendant, James Hill, but said Hill conveyed the parcel of ground to defendant in 1835, and did not convey the land which plaintiff claims until December 14th, 1851; that notwithstanding the possession of said lot with the embankments thereon by defendant, and in disregard of the terms of his own deed, and in violation and defiance of the rights of defendant for so many years possessed in undisturbed possession, the plaintiff made the said cut and built a line of fence upon defendant's land; that said cut was made without any previous notice or warning to defendant and whilst the injunction was still outstanding, and that said cut has removed and destroyed the toe of the slope of the embankment and deprived it of the support, stay and anchorage afforded and given since 1835, so that it is now without proper support and stay, and is developing large cracks and fissures because of the removal of the toe of the embankment; that he has given notice to defendant that he will make further encroachments and invasions upon its land by cutting down, digging up and removing more of the embankment.
It is further alleged that since the issuance of the injunction, although it is to be laid upon and through its property, it has not proceeded with the laying of said pipe line, and that the water is damaging and injuring the embankment and property of defendant, and rendering the same unfit for its railroad purposes and uses; that the excavating, removing and hauling away the earth and soil from the said embankment and the action of the surface water upon it, by reason of the wrongful acts of the plaintiff, will, if not restrained, destroy the proper and safe grade for the operation *Page 412 
of the trains of the defendant and deprive the ties and rails of the tracks of a safe, secure and stable support, "so that public travel, and the movement of freight and trains and engines will be rendered unsafe, uncertain, interrupted and irregular by the sinking and sliding of the said embankment from the causes aforesaid; and will utterly and irreparably ruin and destroy the said embankment for the corporate purposes for which the defendant corporation for so many years past has been, and is now using and employing it," etc.; "that it is absolutely imperative and essential in the discharge of the duties of the defendant corporation as a public carrier of freight and passengers under its charter powers and obligations that leave be granted to the said defendant corporation to repair the mischief and harm done by the said wrongful acts of the plaintiff, by taking the necessary steps and precautions to secure the said embankment from any further sinking, sliding and disintegrating by reason of the said wrongful acts of the said Louis Silbereisen."
The petition then prays (1) that upon final hearing said Silbereisen, his agents, etc., be perpetually enjoined from excavating, removing or hauling away the earth, soil and other material from any part of the said embankment and from any part of the land of defendant corporation within the lines of the deed from James Hill to it; that the said defendant corporation may be quieted in its right to the enjoyment of said land as above set forth, and be decreed to have the right to use and enjoy the same, etc. (2) That in the meantime, and until this cause can be fully heard and determined said Silbereisen be restrained from excavating, removing or hauling away the earth, soil and other material from said embankment, and from any part of the land of defendant contained within the lines of said deed. (3) That in the meantime and until this cause can be fully heard and determined that the railroad company be given leave and *Page 413 
permission to make the aforesaid embankment safe for public travel, and (4) for general relief.
An order was passed on that, directing that an injunction be issued as prayed in the second paragraph of the prayer for relief and that "Leave be and the same is hereby given to the said Baltimore and Ohio Railroad Company to make the aforesaid embankment safe and secure for public travel and use by the said railroad company in whatever way may be necessary within the limits of the property rights of the said Baltimore and Ohio Railroad Company, provided, however, that if the said Baltimore and Ohio Railroad Company shall, in so doing, encroach upon or enter upon the land of the said Louis Silbereisen, it shall be responsible therefor to him in damages, unless the said company shall otherwise agree with the said Louis Silbereisen."
That petition was filed under section 199 of Article 16 of the Code of 1912, which provides that, "The Court may at any stage of a cause or matter, on the application of any party thereto, or party in interest, by motion or petition, or of its own motion, order the issue of a mandate (affirmative injunction) or injunction, directing and commanding any party to such cause or matter, or any party properly brought before it under the existing practice, to do, or abstain from doing any act or acts," etc. The case of Horner v. Nitsch, 103 Md. 508, and others cited in the notes to that section, sufficiently sustain the right of the Court to issue an injunction in a case of this kind, and to avoid the necessity of discussing it.
The plaintiff (appellee) filed an answer to the petition in which he denies that the embankment, as at present constructed, is of the same grade, width, slope or elevation it was when originally constructed, and alleges that the railroad company has been constantly moving over its road bed and expanding its embankment. He also alleges that all he did was on his own land and he only removed earth that was on his property. He admits that he has no claim to *Page 414 
any part of the land conveyed to the defendant by the deed of James Hill. The whole property originally belonged to James Hill and as the deeds under which the appellee claims expressly limit the conveyance of his land to the lines of the property conveyed by said Hill to the railroad company, it is not contended by him that he has any right to the property so conveyed to that company, but the controversy is as to where the dividing lines between the properties are. By agreement the case was set down for final hearing and decree on the bill of complaint, motion or petition of defendant, answers and testimony filed and taken. A large amount of testimony was taken in open Court and on February 27th, 1913, the Court decreed that the orders filed on November 28th, 1910 (granting an injunction to the plaintiff), and January 16, 1913 (granting an injunction to the defendant) be rescinded, and that the petitions upon which they were passed be dismissed without prejudice to any proceedings at law that either of the parties may be advised to take. From the order or decree dissolving the injunction and dismissing the petition of the railroad company it took this appeal.
It will not be out of place to remark that this is the kind of case which could be settled more satisfactorily out of Court than in it, if each party is inclined to recognize the rights of the other. The land in controversy must be of very little value, and while the railroad company has no right to encroach upon the property of the appellee without first acquiring the right to do so by legal means, the evidence tends to show that the drain pipe it was laying when the plaintiff obtained the injunction would have been to the advantage of both parties. If it be conceded that the embankment has spread beyond where it was when first built, that does not in any way settle the correct location of the divisional lines, but if the railroad company has encroached upon the appellee's property, and it is necessary for its charter purposes, it should be purchased or condemned. *Page 415 
Without deeming it necessary to discuss the evidence on the subject, we are satisfied that we cannot determine from the plats and testimony now before us where the divisional lines in fact are. The locations of neither party as made are sufficiently well established to justify a Court of Equity in passing a decree fixing them. The question therefore to be determined is, whether under the evidence and circumstances the Court ought to have held the case until the lines can be properly established. We cannot agree that the evidence did not show danger to this embankment by reason of the acts of the appellee. It may be that the slide will not be dangerous if it is taken care of, but if the appellant is to be limited to the line claimed by the appellee, it may also be that it cannot be properly taken care of without an interruption to the running of the trains, and in railroad construction at a place which is ordinarily difficult to protect there should not be added to it other difficulties which may endanger the lives of the employees of the company and of the traveling public. There is ample evidence in the record to show that the water had been backed up into and against the embankment, which, together with the removal of what is spoken of as the toe of the slope, has caused cracks in the embankment, one of which is from twelve to eighteen inches wide, and about thirty feet long. Unquestionably those cracks were caused, at least in part, by acts of the appellee. It is not contradicted in the record that they came a few days after the toe of the slope was removed. The testimony of Messrs. Zepp, the track supervisor, Staubitz, the track foreman, and Trench, the division engineer, undoubtedly tends to show a dangerous condition of this embankment, caused in part at least by the acts of the appellee and there is nothing we find in the record to the contrary, as we do not understand Mr. Trench's testimony to be subject to any other interpretation. It is true that the order of the Court granting the injunction at the instance of the appellant gave it leave, "to make the aforesaid embankment safe and secure for public travel and use by the said railroad company in whatever way may be necessary *Page 416 within the limits of the property rights of" that company, but the very question in controversy was where those limits were.
The proviso at the end of the order — that if the railroad company "shall, in so doing, encroach upon or enter upon the land of the said Louis Silbereisen, it shall be responsible therefor to him in damages, unless the said company shall otherwise agree with the said Louis Silbereisen" — could scarcely be said in view of the previous part of the order which expressly said "within the limits of the property rights of" the company to release it from the effect of the injunction which was issued at the instance of the appellee, in so far as the land in dispute is concerned. If it was so intended, it ought to have said so, as those taking steps to make the embankment safe and secure for public travel and use of the railroad company might well have supposed they could not go upon the disputed strip without violating the injunction. But at any rate that order was rescinded on February 27th — only six weeks after it was passed — by the one now appealed from. That time might or might not be ample to do the necessary work, if the injunction did not prohibit the agents of the company from going upon the disputed strip, as that would depend upon what had to be done, the condition of the weather and other circumstances. There is ample authority for the continuance of the injunction issued at the instance of the appellant, at least until the rights of the parties can be settled at law, and we think that course should have been pursued.
In White v. Flannigain, 1 Md. 525, CHIEF JUDGE LE GRAND, after reviewing some earlier cases, said on page 543 that a Court of Equity will interfere: "1st. To prevent irreparable mischief or ruin. 2nd. To prevent a multiplicity of suits; and 3rd, where it is required by some peculiar circumstances;" and again, he referred, with approval, to what CHANCELLOR KENT said in Jerome
v. Ross, 7 Johnson's Chancery, 315: "1st. That an injunction will not be granted to restrain a trespasser, merely because heis a trespasser. *Page 401 
lowed them under their petition for same the share thereof which would otherwise be awarded to their clients, if no such fee was paid out of the whole estate, would be returned to their clients.
(6) That at the time of the payment of $3 821,89 a formal assignment of the portion of the fee (being 1/5 thereof) was made to the plaintiffs, so that in any event, only $8,000.00 of the fee can come into the hands of the appellants.
The evidence upon the part of the appellees as incorporated in agreement No. 1, filed in the case, is to the following effect:
(1) That each of the defendants has a legal or equitable interest in a considerable number of the shares of the capital stock of the Whitaker Iron Company and the Whitaker-Glessner Company, and each of their male defendants is a director in and the same are officers in either one or both of the companies; the companies being those mentioned in the bill of complaint.
(2) That each of the defendants has not been benefited by the decree passed in this cause and the distribution made thereunder.
(3) That each was familiar with the facts in connection with the estate, the investment of its funds and the condition of its affairs, and was perfectly willing to allow the same to remain as they were until the death of Mary L. Whitaker, the life tenant, and that each of the defendants did not want any distribution of any portion of the estate prior to her death, and was at the time of the institution of this suit and ever since opposed to the distribution or partial distribution being made.
(4) That upon the institution of this suit all of the defendants joined in retaining George A. Blake and Frederick T. Haines as their solicitors to represent and appear for them in this litigation and to oppose vigorously the prosecution of the suit by the plaintiffs and to do everything that could *Page 402 
legally and properly be done to defeat a distribution as sought in the bill filed in the cause.
(5) That at the time the suit was begun and ever since, the defendants desired the residuary estate of George P. Whitaker, deceased, to remain undistributed until the death of Mary L. Whitaker, because they believed it was to the advantage of the residuary legatees under the will of the deceased, for the reason that the estate's funds were invested in a way that they considered safe, and that produced a much higher income than could otherwise be obtained; that the investment was in their opinion most desirable and advantageous, and it is a fact that it caused the residuary estate to grow in twenty years from thirty thousand dollars ($30,000) to three hundred thousand dollars ($300,000); that the investment was particularly pleasing to them for the additional reason that it was with the above-named companies in which these defendants were stockholders and with the affairs and business of which these defendants were perfectly familiar; that they did not have need of their respective shares of the residuary estate or any part thereof at the time of the institution of this siut nor since, nor of the income therefrom, but preferred, because of the excellent investment of the same and the consequent great increase thereof, to have said residuary remain where and as it was until the death of said Mary L. Whitaker; that said Mary L. Whitaker is now at least eighty years of age.
That the defendants did not employ the solicitors of the plaintiffs, to wit, James M. Munroe and John S. Strahorn, nor either of them, nor agree to become in any manner responsible for their fees, or any portion thereof; that they did not desire, solicit or sanction their services, and now state most emphatically that the solicitors have not done anything for them nor benefited them in any particular in this litigation, or in any other manner, but on the contrary, what the solicitors have accomplished, to wit, the distribution of a portion of the residuary estate, is against the interest of the *Page 403 
defendants, contrary to their wishes and constitutes that which they did not want to occur until the death of Mary L. Whitaker; that they do not owe said solicitors anything, and object to paying the fee of ten thousand dollars ($10,000.00) asked for, or any portion thereof; that the solicitors were employed by the plaintiffs in this cause, and said employment and the institution of this suit was hostile to the defendants and each of them, and against their interests and without their consent or approval, and that they were opposed to the object of the suit and vigorously resisted it, and did not willingly accept said distribution, but were compelled by order of Court to do so.
Upon the facts which we have stated, and those disclosed by the record, we concur in the conclusion reached by the Court below, that the appellants are not entitled to be compensated out of the common fund for the services rendered, as the attorneys for the plaintiffs, as claimed by them.
The counsel fee in controversy in this case, we think, comes within the principles laid down and announced by this Court inMcGraw v. Canton, 74 Md. 554, and B. O.R.R. Co. v.Brown, 79 Md. 442, and are decisive of the questions presented on this appeal. These cases have been cited and approved by this Court in the more recent cases of Lyon v. Hires, 91 Md. 416;Title Co. v. Burdette, 104 Md. 666; Griffith v. Dale,109 Md. 700, and Walker v. Waters, 118 Md. 208, and are clearly controlling upon the facts of this case.
The cases of Davis v. Gemmell, 73 Md. 530, and TerminalFreezing and Heating Company v. Whitelock et al., 120 Md. 408, relied upon by the appellants, are unlike this and were decided upon a dissimilar state of facts and upon principles not applicable in this case.
In the case at bar, it is not disputed, that the appellants were employed exclusively by the plaintiffs, who owned one-fifth of the estate, and they have been paid a fee of $3,821.89 *Page 404 
for the services rendered by them out of the fund distributed to their clients in accordance with their contract. They were not employed by the defendants nor were their services either accepted, adopted or acquiesced in by the defendants.
The testimony of the appellants themselves is, that they had an agreement with their clients to prosecute their suit for them for five per cent. (5%) of whatever amount was paid to their clients under any distribution brought about through their efforts in the suit, and they have been paid this sum.
The result of the allowance of the fee, on the facts of this case, would be to require the plaintiffs to pay the sum of two thousand dollars out of the $76,435.70 of their distributive share, and the defendants, the owners of four-fifths of the estate, to pay the sum of $8,000.00. Practically this conclusion would refund to the plaintiffs' clients the sum of $1,821.89, paid them out of the fee of $3,821.89, and would allow the appellants an additional sum of $8,000.00 to be paid by these defendants. As was said by JUDGE PAGE in Lyon v. Hires,91 Md. 418, "It is difficult to perceive any ground according to well established principles, upon which these attorneys' fees can in this case be made a charge upon the common fund. It is true the suit resulted in a common benefit to both appellees and appellants, but that alone is not sufficient. Before a legal charge can be sustained there must be a contract of employment, either expressly made or superinduced by the law upon the facts of the case, McGraw v. Canton, 74 Md. 559. Unless such contract express or implied can be established, the party who engages counsel must pay for his services." He further said: "The appellants in this case acted solely for themselves in prosecuting the New Jersey suit. Their object was to recover the legacy for their own benefit, and having done so without any arrangement in fact, or to be implied by the circumstances, with the appellees, the latter can not be called upon to contribute out of their share of the fund to the payment of *Page 405 
counsel fees." And to the same effect are the cases of Carter
v. Wake, L.R. 4 Ch. Div. 605; Wilson v. Kelly, 30 S.C. 483;Ex Parte Lynch, 25 S.C. 193; Hand v. R.R. Co., 21 S.C. 178;Grimball v. Cruse, 70 Ala. 544; Hill v. Childress,18 Tenn. 515; Roselius v. Delachaise, 5 La. (Annual Rep.) 481.
In Koenig v. Ward, 104 Md. 566, it was said: The purpose and object of the proceedings were, not to recover the estate or to protect it from spoilation, but to determine who should get it, and in what proportions. The practical question litigated and settled was one of distributive right, to wit, whether the estate should be divided between the beneficiaries under the will or the heirs-at-law and distributees of the decedent. It was not an issue between the estate and third parties, but one interpartes, those claiming to be interested in the distribution. Under these circumstances, it was held in that case that counsel fees should not be allowed out of the estate.
In the case at bar the proof shows that the defendants employed counsel to represent them in the litigation, and the proceedings were conducted on the part of the plaintiffs in opposition to their wishes and as claimed, adverse to their interest. They did not stand by and sanction the services, but interferred and objected, and now claim that they were not benefited by the litigation in any particular, except that an existing fund has been distributed a very few years earlier than it otherwise would have been, in accordance with the wishes of the plaintiffs and in opposition to the wishes of the defendants, and they would have received it later on, even if said litigation had not been instituted.
The fact that a bond was required of the trustee, although none was directed by the will, was a matter entirely within the power of a Court of Equity, after having assumed jurisdiction of the estate, according to the circumstances of the case. It must be assumed that a Court having charge of a fund, will do what is necessary or proper to protect it, either upon direct application or when it appears that the circumstances *Page 406 
of the case require it. Smith v. Michael, 113 Md. 18; Myers
v. Safe Deposit Co., 73 Md. 413; Oesterla v. Gaither,90 Md. 40.
It will be seen that the principal relief sought by the bill filed by the plaintiffs in this case was a distribution of the funds of the residuary estate of Mr. Whitaker, and a construction of his will, and this was determined in Coudon v. Updegraf,117 Md. 71.
The position of the plaintiffs on the record in that case was one of absolute antagonism and hostility to the defendants, and the plaintiffs were opposed by all of the defendants in the litigation.
We have been referred to no case in this, or any other jurisdiction, where counsel fees have been allowed out of a common fund for legal services rendered on a state of case as disclosed by this record.
We must deal with the case as presented by the record, and on the well settled principles of law established by the decisions of this Court, and so treating it the order of the Circuit Court for Cecil County disallowing the fee will be affirmed.
Order affirmed, with costs. *Page 407